George F. Langbeot, Referee.
— This action is brought to compel performance of a contract of sale of two lots of land on the westerly side of Fifth avenue fifty feet and five inches from the north-westerly corner of One Hundred and Fourteenth street, in the city of New York, for which defendant agreed to pay $22,500. He refuses to make the payment because he says the plaintiff’s title is derived from a referee’s deed under a partition sale in an action brought by Albert Mershlahn and wife against Henry Bohlken and others; that the lots belonged to one Glaus Bulwinkel, and he was not made a party to the action, nor did he appear therein. The defendant further claims that there was no proof in that action that Glaus Bulwinkel was dead, or had died intestate, or that the parties to the action were seized of said lots; that the court acquired no jurisdiction over Glaus Bulwinkel, and that the sale was void and gave no title to the plaintiff as purchaser. It appears from the documentary evidence and proof herein that Glaus Bulwinkel became the owner of the two lots in fee, by deed in the year 1858.
On the 15th day of August, in the year 1860, he made a mortgage thereon, including a lot on One Hundred and *467 Thirteenth street and Fifth avenue, for $6,000, to John C. Cheesman, payable August 1, 1861. Gn the 22d day of August, 1862, John C. Cheesman commenced a foreclosure suit of his mortgage against said Claus Bulwinkel. No other person was named as a party to the action, and publication of the summons as for service upon him was ordered September 9, 1862. Gn the 18th day of November, 1862, John C. Cheesman having died, the action was by order continued in the name of the executrix and executor of his last will and testament, and next day the referee made his report of the amount due on the mortgage. On the 20th day of November, 1862, a decree of sale was made, and on the 13th day of December, 1862, the lots were conveyed to the plaintiffs, the executrix and executor, who • had bought them on the sale. About six years afterwards, on the 19th day of Hay, 1868, Martha K. Cheesman and Timothy Matlock Cheesman, executrix and sole surviving executor of John C. Cheesman, deceased aforesaid, published notice of sale of said two lots by them, including the two adjoining lots and the lot on One Hundred and Thirteenth street and Fifth avenue, at public auction on the 13th day of August, 1868, in proceedings to foreclose said mortgage by advertisement under the statute. The two adjoining lots and the One Hundred and Thirteenth street lot were sold to Terrence Farley for $13,300; and this sum being more than sufficient to pay the mortgage on the four lots, the two lots in question were not sold and were considered released. On the 24th day of February, 1869, the said executrix and executor of Mr. Cheesman made a quit-claim deed to Gershe Bohlken, wife of Henry Bohlken, Dorethea Meislahn, wife of Albert Meislahn, John Meyer, Henrietta Barth, wife of August Barth, Augusta Van Axte and Matilda Van Axte,. all of the city of New York, of said two lots, which was duly recorded. In this deed the two lots are described as distant fifty feet two and one-half inches from the north-west corner of One Hundred and Fourteenth street and Fifth avenue, and running *468 northerly along the westerly side of Fifth avenue fifty feet eight and one-half inches, whereas the complaint describes them as fifty feet five inches from the north-west corner of Fifth avenue .and One Hundred and Fourteenth street, and running northerly fifty feet six inches along the westerly side of Fifth avenue. Ho point as to this difference of description, however, has been made by the defendant upon the trial of this action.
It is not, however, stated' who these grantees are. Gershe Bohlken and Dorethea Meislahn were given each one-third and the other grantees each one-twelfth. On the 12th day of September, 1871, Dorethea Meislahn filed her complaint against these parties to partition or sell the two lots among them, alleging that on or about the-day of-, 1862, Claus Bulwinkel departed this life intestate seized in fee of the two lots, describing them fifty feet two and one-half inches from the corner, and fifty feet eight and one-half inches along Fifth avenue as described in said quit-claim deed, and that he left him surviving Dorethea Meislahn and Gershe Bohlken, his sisters, John Meyer, his nephew, Henrietta Barth, Augusta Tan Axte and Matilda Fink, his nieces, his' only heirs-at-law.
It does not appear that any attempt was made to prove the death of Claus Bulwinkel, that he died intestate, or that said parties were his heirs. The plaintiff’s attorney was a witness in open court, and was examined and testified as to other matters. There was no reference as to title, and no other or further evidence. The parties consented in writing to the sale of the property, which was acknowledged before a notary public and is annexed to the judgment-roll. The judgment is dated October 24, 1871, and states that on motion of plaintiff’s counsel “ judgment of this court is rendered that all the statements of the complaint in this action are true as therein stated,” * * * “ and that the parties to this action are seized in fee simple and possessed of the premises described in the complaint.” The record of this partition suit produced in evidence on this trial discloses no such evidence. *469 None of the parties were examined to prove that any of them were heirs of Claus Bulwinkel. It seems to have been conceded and sufficient because it was alleged in the complaint. None of the parties answered, excepting the defendants Fink and Van Axte, and they consented that their answers be stricken out. The lots are described as distant fifty feet ten and one-half inches from said corner, and running northerly on said westerly side of Fifth avenue fifty feet eight and one-half inches. A judgment for the sale of the lots was filed October 24, 1871, and they were sold by the referee December 11, 1871, who, on the 3d day of April, 1872, conveyed the same to the plaintiff Sigismund J. Seligman by the same description. All the said parties to said partition action also made a deed to the plaintiff conveying all their rights and interests in the lots, the description being fifty feet five and one-half inches from the north-west corner, and running northerty along the westerly side of Fifth avenue fifty feet five and one-half inches. But again, no objection is made by the defendant as to this second difference in description. This deed is dated January 5, 1872, and acknowledged by the various parties January 8 and April 2, 1872, and is recorded April 9, 1872.
On the 23d day of July, 1883, the plaintiff made the contract with the defendant, which the latter refused to perform and upon which the plaintiff brings this action. Evidence was given upon the trial of this action of the facts omitted in the partition suit. It was shown that Claus Bulwinkel had a grocery and liquor store at No. 374 Sixth avenue, south-east corner of Twenty-third street, New York city, whereon the well known Booth’s theater was built. He left said city in the year 1860 without informing any of his relations that he was going away or where he was going to. One of his sisters, Gershe Bohlken, testified that until the year 1861 he resided in Montieello, Sullivan county, state of New York. He then again disappeared, and all knowledge of him was lost by his relations until the 25th day of November, 1862, when the *470 “ Brooklyn Daily Times ” newspaper contained an article of the killing of Claus Bulwinkel by Indians in the overland route to California. The article is headed “More Indian massacres — Murder of emigrants on their way to the Salmon River Mines,” and is from the St. Paul Press, Hovember thirteenth, written by a correspondent of the Mankato Record, William H. Sargent, who left that place in May before for the said mines, and who wrote from Rat river, in Washington territory, August eleventh. This gentleman describes and gives a detailed account of Indian outrages which he witnessed, occurring on the 9th day of August, 1882, upon two trains in motion about forty-five miles from Fort Hall, and fifteen miles from Rat river towards the fort. One of the trains which had come from Iowa city lost its commander, killed, and a gentleman from New York city by the name of C. Bulwinkel. (He had some cards of old date showing a former address to have been 374 Sixth avenue.) The correspondent further wrote, “ we helped bury the dead.”
Mrs. G-ershe Bohlken and her husband, Henry Bohlken, both testified that they had not heard from the said Claus Bulwinkel since he left the city of New York, as stated, and that it was the common report and rumor that he had been killed by the Indians and was dead, as mentioned in the newspaper article. Another sister, Mrs. Dorethea Meislahn, wife of Albert Meislahn, testified that the cards found on the person killed by the Indians and buried by William H. Sargent, containing the words and figures “ C. Bulwinkel, 374 Sixth avenue,” describes her brother, Claus Bulwinkel, and that it was the general belief and understanding in the family that this was her brother.
His heirs were as follows: The two sisters just named, John Meyer, his nephew; Henrietta Barth, his neice, wife of August Barth; Matilda Yan Axte, who married John Fink, and Augusta Yan Axte, his neices ; these four persons being .children of Catherine Yan Axte, deceased, formerly Catherine Meyer, a sister of Claus Bulwinkel, and formerly also *471 wife of John Meyer, deceased, father of John Meyer, said nephew. They were all of age excepting Angusta Yan Axte, who was eighteen years of age.
There was no last will or testament of said Claus Bulwinkle, and no proceedings regarding his estate was evér taken in the surrogate’s court, and he had never married.
The first and principal question is as to the death of Claus Bulwinkel. Is the proof sufficient in law to show that he was dead on the 22d day of August, 1862, when the foreclosure suit of Cheesman against him was brought ? The presumption of the duration of” life, with respect to persons of whom no account can be given, has long been settled, ends at the expiration of seven years from the time they were last known to be living. Therefore, in the absence of all other evidence to show that the party, the period of whose death is under discussion, was living at a later period, there was fair ground to presume that he was dead at the end of seven years from the time of the last account of him (See Doe d. George agt. Jesson, H. T., 1805, K. B ; 6 East, 80, cited in Wilkes agt. Lion, 2 Cow. R., 376 ; Same Case, 2 Smith's R., 236; S. P. Row agt. Hasland, 1 Bl. R., 405; Holman agt. Exon, Carth., 246).
This limitation of seven years has been the law of the state of New York since February 6,1788 (See 1 R. L., 103, sec. 1; 3 R. L., 167, sec. 7). An absence of seven years altogether accounts the absentees naturally dead (1 R. S., 749, part 2, chap. 1, tit. 5, sec. 6 ; 2 R. S. [Banks' 6th ed.], sec. 61, 1131).
Section 841 of the Code of Civil Procedure has made provision in the same respect, and reads as follows: “ A person upon whose life an estate in real property depends, who remains without the United States, or absents himself in the State or elsewhere for seven years together, is presumed to be dead in an action or special proceeding concerning the property in which his death comes in question, unless it was affirmatively proved that he was alive within that time.” *472 Thus mere proof of absence for seven years together establishes the presumption of death at the end of that time from the time of the last account of him.
In Rowe agt. Haslard (1 H. Black, 404) it was decided “ in making a title by pedigree, evidence that a man has not been heard of for many years is sufficient evidence prima Facie to prove him dead without issue.” In Lodyd agt. Hunt (4 B. & A., 433), where a tenant for life had not been seen or heard of for fourteen years by a person resident near the estate on which he resided, although ■ not a member of his family, it is pri/ma facie evidence of the death of such tenant.
In Doe d. Benning agt. Griffen (15 East, 293) proof by one of a family, that many years before a younger brother of the person last seized had gone abroad, and that the reports of the family was that he had died there, and that the witness had never heard in the family of his having been married, is pnma facie evidence that the party was dead, without lawful issue, to entitle the next claimant by descent to recover in ejectment. One of the most interesting cases and full of instruction upon this subject, is Eaglds case (reported in 3 Abb. Pr. R., 218, and decided by the learned surrogate Bradford m September, 1856) At page 221 he laid down the rule, quoting lord Denman : “ It is true the law presumes that a person shown to be alive at a given time, remains alive until the contrary be shown, but when the seven years have passed, the presumption of law relates only to the fact of death, and the time of death, whenever it is material, must be the subject of distinct proof. Whoever finds it important to establish death at any particular period, must do so by evidence of some sort.” On page 222 he quotes justice Gibson, in Burr agt. Lewi (4 Whart. R., 150), denying the doctrine of lord Denman and stating the rule thus: “ The presumption of death as a limitation of the presumption of life, must be taken to run exclusively from the termination of the prescribed period, so that the person must be taken to have then *473 been dead and not before.” The evidence shows that the last heard of Claus Bulwinkel, or rather the last account of him, was August 9, 1862, and thus the law would have presumed him dead on the 9th day of August, 1869, seven years thereafter, and the rights and relations of the parties affected by his life or decease would, in the absence of information, have been determined by the statutory presumption.
It is of the highest importance, however, in this case, to determine the death of Claus Bulwinkel at a particular date or time, and for this purpose it is necessary carefully to examine the authorities and evidence applicable to this particular point. The fact of death, especially in the case of absent persons, is not always proved by the most direct testimony, but it is to be inferred from circumstances which either necessarily or usually attend such facts. The force and effect of the evidence is to be determined, and whether the circumstances are sufficiently satisfactory and convincing to warrant the finding of fact. It is well known that hearsay evidence of a fact is not admissible, and the same principle is applicable to statements in writing, but there is an exception to this rule with respect to the death of a person. Proof of a general report and belief of the death of a person is admissible. Thus it was decided in the case of Doe agt. Griffin (15 East R., 293), that the fact of a soldier, or any other individual, was missing at a particular time, accompanied by a report and belief of his death, must be in many eases not only the best, but the only evidence which can be supposed to exist after his death.
In Watson agt. King (1 Stark., 121), where a vessel is proved to have sailed and has not been heard of for two or three years, it is to be presumed that she is lost, but at what time an individual on board of such vessel perished, is to be collected by the jury from the particular circumstances of the case. The burden of proof, of course, is upon the party who asserts the death, thus under plea of coverture where it appeared that the defendant’s husband went abroad twelve years *474 ago, it was held that she was bound to prove that he was alive within seven years (Hopewell agt. De Penna, 2 Camp., 113).
The ease of Jackson agt. Boneham, (15 Johns. R., 226), decided in May, 1818, is a case in point as to the sufficiency of the evidence, both as to identity and death. The action was for ejectment. The letters patent were to “ Moses Minner.” Ether Miner was called as a witness on the part of the plaintiff, who testified that she was a sister of “ Moses Min,er,” who was by trade a gunsmith and lived at Stonington, Conn., and about the year 1774 went to sea. She also proved a letter from Miner to his mother, dated in New York in September, 1775, in which he says “ he had got to be a soldier.” She heard in 1776 that he was with the New York troops, but never heard from him again until fourteen years after the war, when she was told that he had been killed ; that the general opinion in the family was that he was dead, and that he always spelled his name Minor and Miner and not Minner. The testimony as to the death of Moses, and his being with the New York troops was objected to as hearsay but was admitted. There was contention as to the title by defendant upon affirmative proof by deed on his part. The verdict was for plaintiff subject to the opinion of the court which held that the name “ Minner ” was amispelling, as it was not shown there was any man in the army by that name, and it could not affect the identity of the person; that the hearsay evidence was admissible to show his death and the place where he died.
The case of Jackson agt. Etz (5 Cow. R., 314), decided in February, 1826, held that one who was missing at a particular time with a report and general belief of his death, is, it seems, prima faoie evidence of his death; also proof that a man’s intimate acquaintances for several years never heard him speak of his family, father, mother, wife or children, is prima facie evidence that he has no heirs, which is in point as to the evidence that the sisters of Claus Bulwinkel never knew him to be married. The decision in the case of Doe agt. Griffin (15 East, 293) was approvingly quoted by curia, per Suther *475 land, J., in this case, and the ease of Jackson agt. Boneham (15 Johns. R., 228) is cited on page 320.
In the case of McCartee agt. Camel (1 Barb. Ch. R., 456, decided m 1846), while following the presumption as to death, made distinction that the person did not die at any particular time within the seven years, or even on the last day of the term, and if he had a fixed place of residence some inquiry should have been made; the mere fact of his absence did not raise the presumption. (The appellant’s counsel cites many of the authorities as to the presumption and time of death, on page 458.) The decision was based upon peculiar and particular facts upon which the statute was construed. The evidence showed that the respondent, presumed to be dead, was residing at “ Never JDie,” in the vicinity of Baltimore about twelve years before. Letters written to her had not been answered during that time, and the chancellor facetiously says, at page 464, “ it was almost as unsafe to rely upon that circumstance alone as evidence of her death, as it would have been to presume from the name of her last known place of residence, that she would live beyond the usual period of human life.” “ The more rational presumption was that she had gone to some other place, and the letters written to her had not reached her. For if she had died there, she probably would previous to her death have informed some of her acquaintances that she had a mother and some other relatives living in New York, and that the fact of her death would have been communicated to them by letters. The administrator, therefore, is not entitled to protection on the ground that he was legally authorized to presume the respondent was dead at the time the succession opened in 1832. It will be remarked that the person in this case, presumed to be dead, was in fact alive, and asserted her claim to her share in the estate. In the case already referred to (Eagle's case, 3 Abb. Pr. R., 224), the learned surrogate held, “ it is within the province of the court or jury to infer from circumstances, if any appear in proof, the probable time of death; but that if no sufficient facts are *476 shown-from which to draw a reasonable inference that death occurred before the lapse of seven years, the person will be accounted in all legal proceedings as having lived during that period.”
The case of Stonvenal agt. Stephens (2 Daly’s R., 319, decided in June, 1868), sustains the decision in Eagle’s case, as follows: “Although the law presumes that one who is missing is living until- seven years have elapsed, yet circumstances may be shown from which a jury will be warranted in assuming that he was dead at a time within that period.” On page 323 the court cites 1 Greenleaf on Evidence (sec. 41); Merritt agt. Thompson (1 Hilt., 551); Houston agt. Thornton (1 Holt. N. P. C., 242); and Green agt. Brown (2 Str., 1199) as authorities for the decision (See, also, Ringhouse agt. Keener, 49 Ill., 470; Article on Presumption of Life, 29 Alb. Law Jour., 347). In the present case Claus Bulwinkel, left New York city in the year 1860. In the year 1861 he was heard-of as being in this state at Monticello, and on the 9 th day of August, 1862, his death was' reported as killed by the Indians, and his dead body was identified by the cards of his former place of business in this city, in his pocket, and he was buried. He was described by a witness as a dressy man, wearing top-boots, talking of Indians and adventures and going out west. He has not been heard from since, a period of nearly twenty-two years, and all his relations believe in his death as reported. The evidence of William H. Sargeant, the newspaper correspondent, would perhaps have been the best evidence of the death of Claus Bulwinkel, but it does not appear that he knew him personally, and therefore he could have testified to no more than he wrote. The date and particulars of his death, identity and burial are given, and so accepted by all of his relations and those who knew him. This newspaper account was a general report of his death, which all of his relatives believed, and they have not heard otherwise for the past twenty-two years. The facts occurred at a remote period, at a great distance, in an unsettled, uncivilized country, and the nature of the case scarcely *477 admits of better evidence. There does not appear to be any clue by evidence of a higher or more satisfactory character, if it were necessary. The facts are sufficient to draw the conclusion, which is reasonable under the circumstances, that the real time of the death of Claus Bulwinkel, was on the 9th day of August, 1862, seven years before, and that he did not live during the period of the seven years. The foreclosure action by Cheesman was commenced against him on the 22d day of August, 1862, at a time when he was dead, and had been dead and buried thirteen days, the judgment which was entered in the action November 20, 1862, was therefore void, and no title passed under it. No judgment can be entered either for or against a dead man (3 R. S. [5th ed.], 669; 2 Edmond's Stat., 402; Gerry agt. Post, 13 How. Pr. R., 118; Code Civil Pro., sec. 765). It is therefore unnecessary to examine whether the executors of Mr. Cheesman had any power under his will to buy i'n the property forever; if they had, they acquired no title, because the judgment was void. The title to the two lots was therefore in the heirs of Claus Bulwinkel. The foreclosure, by advertisement, did not affect the lots in question because they were not sold, and as the executors acquired sufficient money from the other real property of Claus Bulwinkel included in the $6,000 mortgage, as matter of law these two lots were released from the mortgage, and the quit-claim deed from the executors to the heirs of Mr. Bulwinkel was a matter of form. It must here be mentioned that the grantees named in this quit-claim deed are not described as the heirs of Claus Bulwinkel, deceased, and we only know that fact by the proof in this' action. The action of partition among these heirs was begun September 12, 1871, which was long after the seven years when Claus Bulwinkel would be presumed to be dead by the statute, independent of the evidence of the direct proof of his death. They were sold under the partition judgment to the present plaintiff. The defect of proof of the most material allegations in such a suit, already pointed out, might have been corrected *478 in that suit by opening the proceedings as it must have been a careless oversight, and the proofs given and a resale had if necessary; the plaintiff, of course, would have run the risk of again being the purchaser at a less or greater price than he had bought the lots for. It is not, however, necessary for the plaintiff to acquire kis title through the partition sale, because the heirs of Claus Bulwinkel had a clear, perfect, unincumbered title, and on the 5th day of January, 1872, conveyed the same to the plaintiff by their deed duly acknowledged and recorded. Therefore, when the plaintiff made the contract of sale of the lots with the defendant, on the 23d day of July, 1883, he had a good, perfect title; the defendant was bound to take it and the plaintiff is entitled to judgment in his favor with the costs of this action.
Note.— Although we do not intend as a rule to publish opinions of referees, the above is considered worthy of insertion as citing and commenting on the cases and what facts are sufficient proof of death at a particular time, a question which often affects title to property.—[Ed.